## MUELLER v. MUELLER et al.

(Circuit Court of Appeals, Third Circuit. June 20, 1899.)

PATENTS—IMPLIED LICENSE TO USE—RIGHTS OF PARTNERSHIP OF WHICH PATENTEE IS A MEMBER.

A patentee of a process for ruby-staining glassware formed a partnership with his father, the sole business of the firm being the coloring of glassware by the process of the patent, which required, in the treatment of the ware, muffles or kilns of peculiar construction. The partners purchased a plant, and built a number of the muffles, which they used, conducting the business as equal partners, until the patentee's death, after which his father, as his administrator, in good faith and with the approval of the court, sold decedent's interest in the partnership, the value of which depended almost entirely upon the continuance of the business. The purchaser had no knowledge that the process used was patented. The purchaser and the father continued the business in partnership, afterwards admitting another partner, and on the father's death the surviving partners bought his interest. A few additional muffles were also constructed. Two years after the father's death an administratrix d. b. n. was appointed

for the estate of the deceased patentee, who commenced suit against the firm for infringement and for an accounting. *Held* that, under the circumstances shown, the original firm had an implied license to use the process and such number of mufiles as might be necessary in carrying on the business in the plant it owned, which rights passed, as the most valuable asset of the business, to the subsequent purchasers, and that a court of equity, on the facts shown, would not deprive them of such rights, especially in view of the long acquiescence of the patentee's representatives.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

This was a suit in equity to enjoin infringement of a patent and for an accounting.

In the circuit court the following opinion was rendered by BUFFINGTON, J.:

The present bill in equity is filed by Mrs. Anna E. Mueller, administratrix d. b. n. of the estate of Henry E. Mueller, against Emil F. Mueller and Andrew Stock, co-partners doing business as the Oriental Glass Company, to enjoin infringement of letters patent No. 382,105, issued to said decedent May 1, 1885, for a method of coloring glassware. An accounting is also sought. In the process the glassware is painted with a pigment, and is then burned in a muffle or kiln of a peculiar construction, by methods and means set forth in the patent. The muffles or kilns are of a substantial character, and are built or imbedded in foundations on the ground. On argument several questions were raised, bearing upon the assignments of proportionate interests made by the patentee to different persons pending the original application; of the effect upon those assignments of the substitution of a second application, and the issue of the patent to the applicant on this second application, without mention of his assignees; of the failure of the patentee to record the reassignments made to him by such assignees, and the alleged granting of a license by one of such assignees to one of the respondents, while the ownership of the assigned interest was presumptively in him. In the view we take of this case we have not felt called on to determine these questions, and will pass on to what we regard as the controlling issues, and in doing so will merely state the facts which we deem pertinent thereto. In the fall of 1885 the patentee seems to have perfected the patented process of ruby-staining glass at the glass works of Bryce Bros., in this city, where he worked upon it in connection with his father, C. W. E. Mueller. In the spring of 1886 the Muellers left the employ of Bryce Bros., and, in connection with Florence Werling and Daniel Werling, formed the firm of Mueller, Werling & Co., which firm was exclusively engaged in ruby-staining glass by the method afterwards embodied in the patent. Subsequently the Werlings withdrew from the firm, and thereafter the remaining partners, C. W. E. Mueller and Henry E. Mueller, carried on exclusively the same ruby-staining work under the name of the Oriental Glass Company, each partner carrying a one-half interest. On July 19, 1890, Henry Edward Mueller and C. W. E. Mueller purchased, as tenants in common, certain real estate, which was thereafter used by the firm in its operations. An old building stood on it, and a new one was erected, and ten muffles or kilns, specially adapted to carry out the process shown in the patent, were built in the factory by the firm. The patentee took an active interest in the business of the firm (which, as we have said, consisted solely of ruby-staining glass by the patented process), and so continued to do until his death, January 10, 1891.

What were the rights of such firm on the death of the patentee partner? Did his death terminate all rights on the part of the firm, or its surviving member, to use the muffles which had been constructed by the firm's money with the active participation of the patentee? Were, these muffles, the sole use and purpose of which depended on the patented process, and the use of which process and muffles alone constituted the business of the firm,—were they, by the death of the patentee, shorn of their usefulness, and resolved into valueless heaps of brick, mortar, and iron bands? Were the business, good will, and assets of the firm to be practically annihilated by a denial of the right to use the apparatus which the firm had built, paid for, and used, with the consent and active par-

ticipation of the patentee? The statement of the facts would seem to answer such a contention. Assuredly, if Mueller had withdrawn from the firm during his life, he could not have successfully pursued such an inequitable course, and thus have deprived his partners of a proper use of that which he had induced them to construct. To such a contention the language of Judge Lowell, in Wade v. Metcalf, 16 Fed. 132, might well be applied: "There is another way of stating the case. It is admitted that these machines were the property of the firm. It follows, without reference to section 4899, that all the members of the firm had an equal proportionate right in them. No partner can, by dissolving this connection, acquire a disproportionate share in the joint property. This is a fundamental rule of justice, which does not need to rely on the written law. * * * The plaintiff admitted in that contract [referring to the contract of dissolution in the case by which the plaintiff withdrew], very properly, as I think, that whatever right the firm had would survive to the defendant. That the firm might use the machines which were built by and operated under the supervision of the plaintiff, and used by them for some years with his consent, is clear." In Keller v. Stolzenbach, 20 Fed. 49; Judge Acheson, while deciding that the nonpatenting partner had, after the dissolution of the firm, no right to make, use, and vend the patented machine generally, conceded his right to continue after dissolution the use of such patented invention on a steamboat which had become the property of Pfeil, the nonpatenting partner, on a division of the assets. If Henry Mueller could not have pursued such an inequitable course, had he voluntarily withdrawn, the law will not accomplish the same inequitable results in administering his estate.

On the death of Mueller the patent right was vested in his administrator. His father acted as such administrator, and there is no allegation, or even suggestion, of bad faith or unfair dealing on his part in the administration of his trust. The administration of that trust evidences the assumption by those interested in it of the right of the firm to continue its operations, which, as we have seen, consisted wholly of ruby-staining glass. An appraisement was made of the personal effects of the decedent, and with this was returned a statement of the condition of the Oriental Glass Company, and a valuation of decedent's interest therein. An examination of this statement discloses the fact that the value of decedent's interest in the firm, and therefore the amount to be realized for his estate from a purchaser, consisted very largely in its continuance as a going business. Its liabilities were then almost all due, and an immediate winding up of its affairs could not but have resulted in depreciation. That such a view was taken by the administrator and acted on by the court, and that, on the faith of it, Stock, the respondent, and the purchaser of the decedent's interest, paid his money to the patentee's estate, is to our mind quite clear. In the first place, the patent was not included or appraised among decedent's assets. Did this imply that it was of no value, or that its value was recognized and counted in the business and plant of the firm, whose entire business was the working of its process? The latter would seem to be the correct view. In the assets of the firm are included the ten muffles or kilns constructed by the firm, and these were appraised at $1,676. The purchase of Stock was based on this valuation, and it is clear that he bought, and the representative of Mueller's estate sold, with a view to the continuance of the firm's operations. Stock testified that, when he purchased, he did not know that a patent had been granted; and before the purchase C. W. E. Mueller, the surviving partner, who was also administrator, entered into an agreement with Stock which evidences a contemplated partnership, and the giving of "all the instructions necessary to carry on our business," viz. the methods and the full disclosure of the details of the ruby-staining process covered by the patent. Manifestly, what was intended to be conveyed, and what was thought to be purchased, was not the bare right of the deceased partner to call upon his surviving partner to wind up the affairs of the firm and account for the balance, if any. To attribute such a purpose to the parties would be contrary to the ordinary rules and motives on which business affairs are conducted. Indeed, the fact that the court required Stock to give a bond of $10,000 to indemnify the estate of the decedent against the liabilities of the firm shows that a continuance, and not an immediate liquidation, of the business of the firm was contemplated.

On April 23. 1891, the orphans' court of Allegheny county, on petition of the administrator, setting forth that Andrew Stock, one of the respondents, had offered the appraised value of $2,498.82 for decedent's interest in the real estate and business of the firm, directed a private sale to him, which sale was made by deed of May 2, 1891, and the purchase money was received for the patentee's estate. After this sale Emil F. Mueller purchased an interest, and the business was conducted by Stock and the two Muellers under the same name as before, viz. the Oriental Glass Company, until March 10, 1893, when C. W. E. Mueller died. On June 27, 1893, his interest was purchased by the survivors, who had continued the same line of work, under the same firm name, up to the time this suit was brought. The present plaintiff did not take out letters d. b. n. on the patentee's estate until February 20, 1895, almost two years after the death of the former administrator, and there is no evidence that, during all these years of the use by the Oriental Glass Company of these muffles as their sole and only business, the decedent in his lifetime, or any one after his death. ever questioned the right of the firm to so use them, or demanded any royalty on account of 'their use, until this suit was brought, June 3, 1895; nor did the plaintiff, when on the stand, give any reason for the delay in prosecuting her claim, or allege that she did not know the patent was being infringed. In analogy to the principle, laid down in Prince's Metallic Paint Co. v. Prince Mfg. Co., 6 C. C. A. 647, 57 Fed. 943, that a trade-mark could become so localized and identified with a mine and place of manufacture that it would pass to the purchaser of such mine, factory, and business, it may well be here contended that the sale of the real estate and factory carried with it the right to use the muffles then built. The firm of which the patentee was half owner having built, paid for, and used the ten muffles with the full knowledge, consent, and participation of the patentee, we think the firm must be deemed to have the license, permit, and consent of the patentee to the full and continued use of them for the purpose for which alone they were built. They constituted the physical means for ruby-staining glass. They were the only basis on which the business of the firm rested, and their value, apart from the use for which they were purposely constructed, was relatively nothing. To say that a sale of them, and the receipt by the deceased patentee's estate of a substantial sum of money for decedent's interest in them,—and that, too, from a stranger, who had no knowledge of the existence of a patent,—carried nothing but a right to the brick, mortar, and iron composing them, is to overlook and ignore the substance of the entire proceedings, and is to defeat the real purpose of what was done, and from the doing of which the decedent's estate reaped a material advantage.

So far as the muffles constructed at the time of the sale were concerned, we are clear that their construction, under the surrounding circumstances and the situation of the parties, carried with it an implied license from the patentee, and that such right did not cease with the patentee's death. But we go a step further. We think the license conferred upon the firm, whose sole and only business was the making of ruby-stained glass in that particular establishment, coupled with the manner in which the assets and business of the firm were treated by the decedent's representative (and presumably acquiesced in by his heirs), and sold, evidences the fact that the license conferred, and intended to be conferred, carried with it the right to such reasonable extension and enlargement, in the way of further muffles, as were needed to treat the output of that particular shop. We have here no question of an attempted extension beyond the factory which the firm owned. The three muffles built did not necessitate an enlargement of the factory, nor is it shown to what, if any, extent they were used. Under the peculiar facts of this case, we feel that the building of the three additional muffles cannot be deemed unwarranted and made the ground of infringement. In addition to these facts, we have, as noted, the significant and unexplained silence, inaction, and apparent acquiescence on the part of the patentee and his personal representatives in the use by the respondents and their predecessors of the original muffles. The patentee actively acquiesced in it, the patentee's administrator made no objection, and for his omission to do so neither his good faith has been questioned nor has he been called upon to account for his failure to assert such right. After his death almost two years elapsed before any attempt was made to assert any such claim.

Nor, indeed, was such attempt finally made until it was seen that the purchasers, by their own efforts, had turned a feeble, precarious business into a thriving one. Under such circumstances a court of equity is not inclined to strain its powers to afford relief to those who have been so singularly negligent in a seasonable and timely assertion of their claim. Godden v. Kimmell, 99 U. S. 201; Lansdale v. Smith, 106 U. S. 391, 1 Sup. Ct. 350; Beard v. Turner. 13 Law T. (N. S.) 747.

A decree will be drawn dismissing this bill.

John H. Roney, for appellant.

James K. Bakewell, for appellees.

Before ACHESON and DALLAS, Circuit Judges, and KIRKPATRICK, District Judge.

DALLAS, Circuit Judge. Careful consideration of this record and of the arguments of counsel leaves none of us in doubt as to the correctness of the conclusion which was reached by the court below. The opinion delivered by the learned judge of that court is entirely satisfactory, and we adopt it as adequately presenting our own views. We are satisfied that, as respects the three additional muffles, as well as the others, the finding of an implied license was fully warranted, both in fact and in law, and for that reason the decree is affirmed.